1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| JEFFREY PREST, | CASE NO. 07cv1771 WQH (BLM) |
| Plaintiff, | ORDER ON MOTIONS IN LIMINE |
| vs. | |
| JULIE JERMSTAD; ANDERS JERMSTAD, | |
| Defendants. | |

16
17

HAYES, Judge:

The matter before the Court is  Defendant's Motion in Limine to Exclude the Opinion Testimony of Plaintiff's Expert Witness John C. Lowe, M.A., D.C. (Doc. # 40).

### BACKGROUND

In October 2005, Plaintiff Jeffrey Prest filed a lawsuit in state court against Defendant Julie Jermstad alleging that he suffered injuries as a result of being exposed to toxic levels of lead while living in a house in San Diego, California which he rented from Julie Jermstad (Doc. # 15 at 1).  Prior to the state court trial, Prest sought leave to add Jermstad's son, Anders Jermstad, as an additional defendant.  The state court denied the motion, finding that Prest was unjustifiably delayed in bringing the motion. *Id.* at 3.   Prior to the state court trial, Prest also moved for an order permitting him to add a newly discovered expert, chiropractor John C. Lowe, linking Prest's alleged injuries to lead. *Id.*  The state court denied

the motion, finding that Jermstad would be substantially prejudiced by adding the expert just prior to trial. *Id.* On September 5, 2007, counsel for Jermstad received a letter stating that Prest would voluntarily dismiss his state court action and re-file the matter in federal court because of the state court's denial of Prest's motions to add Anders Jermstad as a defendant and add the newly discovered expert. *Id.* On September 6, 2007, the state court entered the voluntary dismissal of Prest's action. *Id.*

On September 10, 2007, Prest initiated the above-captioned action by filing a complaint which asserts the same claims as those asserted in the state action and names Anders Jermstad as a defendant (Doc. # 1). Plaintiff alleges he rented a house from Defendant Julie Jermstad, a real estate agent, which belonged to her son Defendant Anders Jermstad (Doc. # 1 at 2-3). Plaintiff alleges three weeks after he moved in, he received a photocopied excerpt from a pamphlet approved by the United States Environmental Protection Agency ("EPA") warning of the dangers of lead paint in residences built prior to 1978. *Id.* Plaintiff alleges he had his blood lead levels tested after receiving the pamphlet and learned he had dangerously elevated levels of lead in his blood. *Id.* Plaintiff alleges he then asked Defendant Julie Jermstad to test the house for lead contamination, which she refused to do because "every house in Hillcrest and North Park" contains lead paint.[1] *Id.* Plaintiff alleges he had the house tested by a licensed testing organization, which revealed "virtually every room . . to be contaminated with lead paint chips and lead dust, all with dangerously high levels of lead, posing a substantial health risk to any occupant of the Premises." *Id.* Plaintiff alleges his personal property was contaminated and is unsafe for use. *Id.* Plaintiff alleges he again asked Defendant Julie Jermstad to do lead decontamination on the premises, but that she failed to do so. *Id.* Plaintiff alleges he has fibromyalgia and that his condition became more severe as a result of the exposure to lead and the associated stress. *Id.*

Plaintiff alleged eight claims against Defendants in the Complaint: (1) knowing violation of 42 U.S.C. § 4852d, requiring the "[d]isclosure of certain information concerning

---

[1] Plaintiff alleges the house in question is located at 3829 Texas Street, San Diego, California, which is in the North Park neighborhood. Hillcrest is the neighborhood adjacent to North Park. *See* Google Maps, http://maps.google.com/maps.

lead upon transfer of residential property;" (2) negligent and intentional misrepresentation; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) negligence; (6) breach of the covenant of good faith and fair dealing; (7) breach of the implied warranty of habitability; and (8) breach of Cal. Civ. Code § 1714.

## DEFENDANTS' MOTION IN LIMINE

### A.    Initial Briefing By the Parties

Defendants filed a Motion in Limine to exclude the opinion testimony of Plaintiff's expert witness, chiropractor John C. Lowe, M.A., D.C. (Doc. # 40 at 1).  Defendants contend that Lowe's "opinions relative to fibromyalgia fail to meet the reliability criteria" of Federal Rule of Evidence 702 because "they are based on insufficient facts and data and unsubstantiated, unreliable principles and methods that—the issue of their reliability aside—were not reasonably linked to the facts surrounding Plaintiff's exposure to lead paint." *Id.* Defendants further contend  Lowe "lacks the requisite qualifications . . . to opine on the issue of whether there is a causal connection between lead exposure and Plaintiff's cardiac condition." Defendants contend that Lowe's opinion that exposure to lead triggered Plaintiff's cardiac problems is speculative, rendering it inadmissible even if Lowe is qualified to testify about cardiac problems.  *Id.* at 5.

Defendants claim that "medical science has not progressed to the point that any particular theory as to the cause of fibromyalgia has gained acceptance in the medical profession, thus rendering any avowed expert testimony on the subject scientifically unreliable and therefore inadmissible . . . ." *Id.* at 3.  Defendants cite three cases, *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999); *Vargas v. Lee*, 317 F.3d 498 (5th Cir. 2003); and *Maras v. Avis Rent a Car Sys.*, 393 F. Supp. 801 (D. Minn. 2005), in support of their position.  In all three cases, Plaintiffs were not allowed to present expert testimony asserting that the Plaintiff's fibromyalgia was caused by physical trauma.  Defendants contend that Lowe's opinion that "fibromyalgia was either caused or aggravated by trauma remains scientifically unreliable and, therefore, inadmissible under Federal Rules of Evidence 702" (Doc. # 40 at 4).  Defendants

contends that Lowe conceded that his opinion that "a low metabolic rate predisposed Plaintiff to developing fibromyalgia as a result of" Plaintiff's prior auto accident is "speculation," rendering it inadmissible. *Id.* Defendants further contend that Lowe conceded that his opinion that Plaintiff's lead exposure "constituted a chemical stressor that aggravated his already-fragile condition" is also speculative. *Id.* In support of that contention, Defendants cite Lowe's deposition, in which Lowe calls the connection between lead exposure and an exacerbation of Plaintiff's fibromyalgia "plausible." *Id.*

As to the opinion that lead exposure caused Plaintiff's cardiac problems, Defendants again point to Lowe's use of the word "plausible" in his report and his admission that his theory was "speculative." *Id.* at 5. Defendants note that Lowe conceded that his opinion that lead exposure and Plaintiff's stress related to lead exposure led to the cardiac incident was not based on anything in Plaintiff's medical reports or on any diagnostic tests. *Id.* Finally, Defendants note that Plaintiff has not presented any evidence that Lowe is qualified to testify about cardiac conditions. *Id.*

In his response, Plaintiff contends that medical science has advanced since the cases Defendants cited and offers a new declaration by Lowe reviewing the medical literature associating trauma with fibromyalgia (Doc. # 46 at 1-2). Plaintiff contends "the claim that fibromyalgia is not associated with trauma was not raised in Dr. Lowe's deposition. He therefor[e] did not have an opportunity to respond to it." *Id.* Plaintiff finally asks for a *Daubert* hearing. *Id.* The attached declaration cites a book on fibromyalgia published in 2005 as evidence of advancement in the understanding of fibromyalgia. *Id.* at 4. Lowe states in his declaration: "[m]y use of the word 'speculative' does not mean that my opinions are based on guesswork," and that "each of the opinions offered in my deposition is correct, to a high degree of probability." *Id.*

In their reply, Defendants claim that Plaintiff's attempt to offer "new post-deposition opinions" should be rejected and that even if the new declaration is considered, it does not refute Defendants' contention that the link between trauma and fibromyalgia is speculative (Doc. # 54 at 3).

**B.     Contentions of the Parties at the Hearing**

The Court held a hearing on October 23, 2009.  At the hearing, Plaintiff withdrew Lowe as an expert as to lead exposure and heart conditions.  Defendants conceded that Lowe is qualified to diagnose fibromyalgia, but attacked Lowe's theory that trauma causes fibromyalgia, his proposed link between hypothyroidism and fibromyalgia, and his qualifications to testify that lead exposure caused Plaintiff's fibromyalgia to worsen. Defendants contended that Lowe's textbook was self-published, that his articles are not peer reviewed, and that evidence Lowe cites as authoritative in fact rejects his theories.  Plaintiff contended that Lowe's articles are peer reviewed and challenged Defendants' characterization of the state of the scientific literature.  Because both parties referred to facts which were not before the Court, the Court ordered further briefing on the issues.

**C.     Supplemental Briefing**

Defendants submitted the declaration of one of Defendant's attorneys, James O. McLaughlin, (Doc. # 66) and the declaration of Charles Jablecki, M.D., a neurologist (Doc. # 67).  McLaughlin states that he conducted "an internet search for proponents of theories upon which Lowe relies in rendering his opinion that lead exposure has aggravated Prest's preexisting fibromyalgia in an effort to confirm or disaffirm Lowe's representations that the 'research literature' and 'bulk of scientific evidence' support his opinions." (Doc. # 66 at 2). McLaughlin further states that he did an internet search of Dr. Broda O. Barnes, upon whom Lowe relies in his book, and found a Wikipedia entry, available at http://en.wikipedia.org/wiki/Broda_Otto_Barnes, which states that Barnes's views "were never widely adopted in mainstream medicine . . . but . . . have been embraced by some elements of the alternative medical community."  *Id.*  The Wikipedia entry is attached to the declaration as Exhibit 2. *Id.*  McLaughlin also attaches an article which reveals that Dr. Barry Durrant-Peatfield, a British physician who influenced Lowe's theories, was suspended from the practice of medicine.  *Id.,* Exhibit 3.

Jablecki states that he reviewed Lowe's report and deposition testimony and states that most of Lowe's publications are in online journals where Lowe is on the editorial board of the

publication. (Doc. # 67 at 4). Jablecki notes that Lowe's books appear to have been published by a company registered in Oklahoma by Lowe. *Id*. at 5. Jablecki concludes that Lowe "is attempting in this case to promote a perception of a general acceptance by the medical community of his views on fibromyalgia and thyroid dysfunction through references to publications in his personal online journals and self published books." *Id*. at 5-6. Jablecki goes on to state that he treats patients with fibromyalgia and disagrees with Lowe's conclusion that "thyroid dysfunction is the main underlying mechanism of fibromyalgia." *Id*. at 6. Jablecki goes on to note that one source Lowe referenced in his supplemental declaration actually rejects Lowe's theory of thyroid dysfunction and fibromyalgia, and concludes that "it would be unscientific to permit John C. Lowe, D.C., to testify that thyroid dysfunction is the main cause of fibromyalgia." *Id*. at 7. As for Lowe's conclusion that lead exposure caused Plaintiff's fibromyalgia to worsen, Jablecki disagrees that lead exposure can "exacerbate the symptoms of fibromyalgia." *Id*. at 8. Finally, Jablecki concludes that allowing Lowe to present such testimony "would be analagous to some of the testimony that was given in the initial litigation regarding the effects of silicone breast implants," which relied on anecdotal evidence to mistakenly claim that silicone breast implants caused disease in women. *Id*.

Plaintiff submitted a declaration by his attorney, Michael W. Palmer which states that Lowe's research papers are peer reviewed, but that his articles written for a general audience are not (Doc. # 62-2 at 37). Palmer further states that Lowe's text book was published through a publisher which he partially owns because he would make more money on the book than he would if he published through a specialty press. *Id*. at 38.


**LEGAL STANDARD FOR THE ADMISSION OF EXPERT TESTIMONY**

The proponent of expert testimony has the burden of proving the factual prerequisites necessary to the admissibility of expert testimony by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 592 (1993); Fed R. Evid. 702 Committee Note (2000). In determining whether expert testimony should be admitted, the court must first "determine whether a proposed witness's qualifying training or experience, and resultant

specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact that the witness's proposed testimony will be of assistance to the trier of fact."  4 JOSEPH M. MCLAUGHLIN, JACK B. WEINSTEIN, & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.04[1][b] (2d ed. 2005); *see also* FEDERAL CIVIL TRIALS & EVIDENCE § 11:125 ("[t]he court must examine 'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question'") (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994)).

Once the court has concluded that a witness qualifies as an expert, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597.  A court must find that expert testimony is "properly grounded, well-reasoned and not speculative before it can be admitted."  Fed. R. Evid. 702, Advisory Committee Notes (2000).

In serving this "gatekeeper" function, a district court performs a two-part analysis. *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).  First, a district court "must determine nothing less than whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharmaceuticals (Daubert II)*, 43 F.3d 1311, 1315 (9th Cir. 1995) (internal quotations and citations omitted).  "*Daubert's* general holding–setting forth the trial judge's general 'gatekeeping' obligation–applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire v. Carmichale*, 526 U.S. 137, 141 (1999).  Second, the court "must ensure that the proposed expert testimony is relevant to the task at hand . . . i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.

"Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony." *United States v. Alatorre*, 22 F.3d 1098, 1102-03 (9th Cir. 2000).  A trial judge has "considerable leeway" in deciding not only "how to go about determining whether particular expert testimony is reliable," but also in deciding whether the testimony is reliable. *Kumho Tire*, 509 U.S. at 153.

When considering whether expert testimony is reliable under the first prong of the *Daubert* test, a trial court should consider the factors laid out by the United States Supreme Court including (1) "whether the theory or technique employed by the expert is generally accepted in the scientific community, (2) whether "it's been subjected to peer review and publication," (3) "whether it can be and has been tested," and (4) "whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17 (citing *Daubert*, 509 U.S. at 593-595). The United States Supreme Court noted that the trial judge's reliability inquiry is "flexible," and therefore trial courts can and should consider other factors not specifically mentioned by the United States Supreme Court in *Daubert*. *Daubert*, 509 U.S. at 594. *Daubert* does not require that a theory be generally accepted: "methods accepted by a minority in the scientific community may well be sufficient" if other indica show the reliability of the methods the expert used. *Daubert II*, 43 F.3d at 1319 n.11.

As noted by the Court of Appeal for the Ninth Circuit in *Daubert II*, "one very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317; *see also Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). Where expert testimony is based on independent research, "what is required is 'proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.'" *Clausen*, 339 F.3d at 1056 (citing *Daubert II*, 43 F.3d at 1318). However, where expert testimony is not based on independent research and has not been subjected to peer review and publication, the "proffer of scientific testimony may still be deemed reliable enough to be admitted." *Clausen*, 339 F.3d at 1056. Indeed, "there may well be good reasons why a scientific study has not been published," for instance "it may be too recent or of insufficiently broad interest." *Id.* "Where peer review and publication are absent, 'the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific evidence method, as it is

1 practiced by (at least) a recognized minority of scientists in their field.'" *Id.* (citing *Daubert*

2 *II*, 43 F.3d at 1319).

3         Trial courts have also considered whether the expert has "unjustifiably extrapolated

4 from an accepted premise to an unfounded conclusion," "whether the expert has adequately

5 accounted for obvious alternative explanations," "whether the expert is being as careful as he

6 would be in his regular professional work," and "whether the field of expertise claimed by the

7 expert is known to reach reliable results for the type of opinion offered." *In re Silicone Gel*

8 *Breast Implants Litigation*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing FED. R. EVID.

9 702 Advisory Committee's Notes); *see also Whisant v. U.S.*, Case No. C03-5121, 2006 U.S.

10 Dist. LEXIS 76321, *6-7 (W.D. Wash Oct. 5, 2006).

11         Second, once the trial court has determined that the expert's conclusions are good

12 science, it must turn to whether the testimony would "assist the trier of fact to . . . determine

13 a fact in issue." *See Daubert II*, 43 F.3d at 1320. This second prong, the "helpfulness" prong,

14 requires the trial court to determine whether there is a "valid scientific connection to the

15 pertinent inquiry as a precondition to admissibility." *Id.* (citation omitted).  When the issue

16 is causation, it is insufficient for an expert to opine that something is "capable of causing" or

17 "possibly caused" Plaintiff's injury. *Id.* at 1321-22.  Rather, the expert must be able to testify

18 that Defendant's conduct more likely than not caused Plaintiff's injury. *Id.; see also In re*

19 *Hanford Nuclear Reservation Litigation*, 292 F.3d 1124 (9th Cir. 2002), *Schudel v. G.E.*, 120

20 F.3d 991 (9th Cir. 1997).  If the expert's proposed testimony about causation can only establish

21 that causation is possible, in the absence of other causation evidence, such testimony in fact

22 goes to *disproving* causation where the standard of proof is more likely than not. *Daubert II*,

23 43 F.3d at 1320.

24

25                                          **ANALYSIS**

26         Plaintiff withdrew Lowe as an expert witness in the area of lead poisoning and heart

27 conditions at the hearing conducted October 23, 2009, so the Court will only address  Lowe's

28 opinions on fibromyalgia.

**A.    Lowe's Training and Experience Related to Fibromyalgia**

Lowe holds a bachelor's degree and a master's degree in psychology from the University of West Florida, and a bachelors degree in human biology and a Doctor of Chiropractic from Los Angeles College of Chiropractic (Doc. # 40-1, Exhibit 2 at 3).[2] Lowe is licensed to practice chiropractic in Texas and Colorado and board certified in pain management by the American Academy of Pain Management.  *Id.* Since 1989, Lowe has specialized in the treatment of patients with fibromyalgia and performed research in this area. *Id.* Lowe states that, along with a research team at the Fibromyalgia Research Foundation, he has "published case reports, open clinical trials, double-blind placebo-controlled treatment trials, controlled studies of fibromyalgia patients' metabolic status, several theoretical papers on the mechanisms of fibromyalgia, and textbook chapters and articles for educational purposes." *Id.*  Lowe also wrote a textbook entitled "Metabolic Treatment of Fibromyalgia" which was published in 2000.  *Id.*  Lowe states in his deposition that he has been deposed as an expert witness in several cases and has previously testified in federal court. (Doc. # 40-1, Exhibit 3 at 5).[3]  The Court finds that Lowe's training as a chiropractor, his experience treating patients with fibromyalgia, and his work doing fibromyalgia research qualify him as an expert witness on the diagnosis and treatment of fibromyalgia.

**B.    Lowe's Opinions on Plaintiff's Fibromyalgia**

(1)    Plaintiff's Low Metabolic Rate Prior to Developing Fibromyalgia

Lowe offers the opinion that Plaintiff had a low metabolic rate prior to developing fibromyalgia (Doc. # 40-1,  Exhibit 3 at 60-61).   Lowe explains that this opinion was based on Plaintiff's description of symptoms such as "avoid[ing] sports and physical activity," "lacking energy," and being "chronically, excessively cold." *Id.* at 75-76.  However, Lowe states "likely it was within the realm of possibility" that Plaintiff had a low metabolic rate which predisposed him to developing fibromyalgia in response to trauma. *Id.* at 60-61.  Lowe

---

[2]Citations to Doc. # 40-1, Exhibit 2 are to the internal pagination of John C. Lowe's report attached to Defendant's Motion in Limine.

[3]Citations to Doc. #  40-1, Exhibit 3 are to the internal pagination of the Deposition of John C. Lowe attached to Defendant's Motion in Limine.

also characterizes this opinion as "speculation" and states that he has "no proof to firmly argue it." *Id.* at 78, 89. Lowe concedes that there are no medical records or test results which support his opinion and that his proposed link between fibromyalgia and thyroid disorders is "not generally accepted." *Id.* at 78-79, 83.

Because Lowe describes this opinion as merely "speculative" and "likely within the realm of possibility," this testimony is inadmissible under Federal Rule of Evidence 702. Speculation as to the Plaintiff's medical history simply cannot assist the jury in understanding the evidence or determining a fact at issue. *See* Fed. R. Evid. 702. The Court therefore grants Defendants' motion in limine as to Lowe's opinion that Plaintiff had a low metabolic rate which predisposed him to developing fibromyalgia.

(2)     Plaintiff's Fibromyalgia

Lowe offers the opinion that Plaintiff "most likely" had fibromyalgia before his exposure to lead and that he certainly met the diagnostic criteria for "severe fibromyalgia" when Lowe examined him on February 11, 2009 (Doc. # 40-1, Exhibit 3 at 61-64). Lowe bases his opinion as to Plaintiff's history of fibromyalgia on Plaintiff's self-reported symptoms, Plaintiff's medical records, Plaintiff's current diagnosis of fibromyalgia, and Plaintiff's prior diagnosis of fibromyalgia *Id.* at 79-85, 92. Lowe stated that it was not clear from the records whether Plaintiff's previous treating physician who diagnosed him as having fibromyalgia used the proper diagnostic criteria, but that nonetheless, based on the prior diagnosis and based on Plaintiff's symptoms, it is "highly likely" that Plaintiff had fibromyalgia before the exposure to lead. *Id.* at 91-92. Lowe bases his current diagnosis on his physical examination of Plaintiff, Plaintiff's self-reporting his pain and his failure to respond to narcotic pain medications, and tests of Plaintiff's metabolic rate Lowe performed. *Id.* at 79-85, 92.

Lowe states he performed the diagnostic test which is medically accepted and that Plaintiff met the criteria set out by the American College of Rheumatology. *Id.* at 79-80. Lowe explains that the American College of Rheumatology diagnostic criteria require pain above and below the waist and pain on both sides of the body. *Id.* at 81. Lowe explains that testing for pain involves using a "pressure gauge designed for pain management specialists"

- 11 -                                              07cv1771 WQH (BLM)

1  and applying pressure to specific spots on the patient's body to determine the patient's pain

2  threshold. *Id.* at 82-83. Lowe tested Plaintiff in 16 spots on Plaintiff's body to measure his

3  pain sensitivity. *Id.* at 82. This testing determined that Plaintiff was "able to take

4  approximately 25 percent of the pressure, without experiencing discomfort, that somebody

5  who has a normal pain sensitivity would take." *Id.* at 83. Lowe further explained that it is

6  unlikely that Plaintiff attempted to "influence the result" of the test by claiming to feel pain

7  before he actually did because the of consistency of Plaintiff's pain threshold across the

8  different points. *Id.* at 82-83. Lowe claims that faking such results would be a "very, very

9  difficult thing to do." *Id.* at 83. Lowe also stated that Plaintiff exhibited "all 13 of those

10  classic fibromyalgia symptoms" outlined by "a rheumatologist Fred Wolf," although he does

11  not elaborate what those thirteen symptoms are. *Id.* at 83-84. Lowe also notes that Plaintiff

12  "failed to respond to narcotic medications, and that is something that's typically found and

13  reported by many researchers." *Id.* at 85. Finally, Lowe points to Plaintiff's low metabolic

14  rate as an indicator that Plaintiff has fibromyalgia. *Id.* at 84. However, he concedes that his

15  theory that fibromyalgia is caused by thyroid deficiencies is "not generally accepted."

16       In addition to determining that Plaintiff has fibromyalgia, Lowe determined that

17  Plaintiff's fibromyalgia is severe. *Id*. at 79-81. Lowe described his method of measuring the

18  severity of fibromyalgia as dividing the body into 36 sections and determining the percentage

19  of those sections where a patient has pain. *Id.* Lowe also noted that Plaintiff's symptoms were

20  "extremely severe" based on Plaintiff's self-reporting. *Id.* In Lowe's opinion, Plaintiff's

21  symptoms are significantly worse now after the lead exposure than they were before the lead

22  exposure.

23       Lowe's conclusion that Plaintiff had fibromyalgia before the lead exposure   is

24  sufficiently reliable and helpful to the jury to be admissible. Although Lowe concedes that he

25  cannot tell with certainty whether Plaintiff met the diagnostic criteria, his opinion is that it is

26  "most likely" or "highly likely" that Plaintiff had fibromyalgia before the lead exposure. *Id.*

27  at 61-64, 91-92. This opinion is supported by his reliance on Plaintiff's medical records,

28  Plaintiff's previous diagnosis of fibromyalgia, Plaintiff's current diagnosis of fibromyalgia,

and by Plaintiff's description of his symptoms.  79-85, 92.

1   Lowe's conclusion that Plaintiff has fibromyalgia now is also admissible, as Defendants

2 have conceded.  Defendants do not dispute that Lowe used a widely-accepted test to determine

3 whether Plaintiff currently has fibromyalgia.  Because a widely-accepted test was used, Lowe's

4 conclusion is sufficiently reliable and helpful to the jury to be admissible.  Lowe's method for

5 determining that Plaintiff's fibromyalgia is worse now than it was before the lead exposure is

6 also reliable.  Comparing Plaintiff's medical records from before the lead exposure with his

7 own analysis of Plaintiff's condition now and using this information in combination with

8 Plaintiff's self-reported symptoms is a valid method of arriving at the conclusion that

9 Plaintiff's fibromyalgia is worse now than it was before.[4]

10   However, Lowe's additional test used to determine that Plaintiff has fibromyalgia is not

11 sufficiently reliable to be admissible.  Lowe concedes that his theory that a depressed

12 metabolic rate causes fibromyalgia is not generally accepted and Plaintiff has not provided

13 sufficient evidence that a minority of the scientific community accepts Lowe's theory or

14 sufficient evidence of other indica of the reliability of Lowe's methods in reaching that

15 conclusion. *See Daubert II*, 43 F.3d at 1319 n. 11; *see also* Doc. # 40-1, Exhibit 2.

16   Although Lowe claims in his supplemental declaration that his theory that thyroid

17 disorders cause fibromyalgia "has received widespread, although by no means universal,

18 acceptance among concerned researchers," he does not cite  studies performed by other

19 researchers who are not associated with his organization supporting his results nor does he give

20 examples of other "concerned researchers" who accept his conclusions (Doc. # 46 at 9).  In

21 fact, one of the sources Lowe cites as supporting another of his theories, Daniel J. Wallace,

22 M.D. and Daniel J. Clauw, eds., Fibromyalgia and Other Central Pain Syndromes, at 190

23 (2005), overtly rejects Lowe's theory that hypothyroidism causes fibromyalgia.  *See* Doc. #

24 67  at 6 and Exhibit F ("[L]ack of thyroid hormone . . . mimics the symptoms of fibromyalgia

25  . . . [which is] an important diagnosis to exclude when making the primary diagnosis [of

26 fibromyalgia.]")  The Court therefore grants Defendants' motion in limine as to Lowe's

27 testimony about the link between fibromyalgia and metabolism.  Because the Court concludes

28

---

    [4]Lowe's theory that lead exposure caused the exacerbation of Plaintiff's symptoms is discussed below.

that Lowe's testimony about Plaintiff's metabolism is inadmissible with or without the additional evidence submitted with Plaintiff's response, the Court will not address Defendant's contention that attempting to submit additional evidence at this late stage is improper.

(3)     Plaintiff's Fibromyalgia Developed as a Result of a Car Accident

Lowe offers the opinion that Plaintiff's fibromyalgia developed as the result of a car accident (Doc. # 40-,  Exhibit 3 at 62). He states "the trauma, most likely, was a precipitating factor that resulted" in Plaintiff developing fibromyalgia.  *Id.*  In particular, Lowe believes that the fact that Plaintiff suffered an injury to his cervical spine makes it likely that the accident triggered fibromyalgia, or at least a worsening of Plaintiff's previously existing symptoms. *Id.* at 77.  Lowe bases this opinion on "studies in Israel and in the United States [that] have shown that patients who have cervical and/or neck injuries are far more likely to . . . develop fibromyalgia."  *Id.*   One such study showed that "52 percent of fibromyalgia patients developed the condition after physical trauma.  And the likelihood that a patient with cervical trauma will develop the condition . . . is I think, something like 17 percent higher."  *Id.* at 85-86.   He further bases this opinion on his years of experience treating patients who have experienced "a severe exacerbation of symptoms that were in mild and intermittent form in the past" following a traumatic neck injury. *Id.*  Lowe concedes that "no medical records . . . show that  [Plaintiff] had an exacerbation of a previous fibromyalgia condition based on this auto accident." *Id.* at 89.  Lowe further concedes that his opinion is "speculative."  *Id.* at 89-90. Plaintiff subsequently submitted a further declaration and report from Lowe with his response to Defendants' motion in limine citing additional literature which Lowe states supports the link between traumatic injury and fibromyalgia (Doc. 46-1).  Lowe particularly relies on one source in his additional report, which states that data "'suggest that it is *biologically plausible* that physical trauma, acting as a stressor'" could lead to the "'chronic widespread pain'" that characterizes fibromyalgia. *Id.* at 7 (citing Daniel J. Wallace, M.D. and Daniel J. Clauw, eds., Fibromyalgia and Other Central Pain Syndromes (2005)) (emphasis added).

Although Lowe mentions studies which establish a link between trauma and fibromyalgia, Plaintiff has not provided any such studies to the court.  In the absence of these studies, the Court is left to rely on Lowe's deposition, which concedes that the opinion that

Plaintiff's car accident led to or seriously exacerbated his fibromyagia is "speculative." Lowe's additional declaration and report do not change that conclusion. The additional source Lowe provided states that the theory that physical trauma leads to fibromyalgia is merely "biologically plausible." Because the opinion is admittedly speculative, this testimony is inadmissible under Federal Rule of Evidence 702. Speculation as to the origins of Plaintiff's fibromyalgia cannot assist the jury in understanding the evidence or determining a fact at issue. *See* Fed. R. Evid. 702. The Court therefore grants Defendants' motion in limine as to Lowe's opinion that Plaintiff's fibroymalgia was triggered by his car accident. Because the Court concludes that Lowe's testimony is inadmissible with or without the additional evidence submitted with Plaintiff's response, the Court will not address Defendant's contention that attempting to submit additional evidence at this late stage is improper.

(4)     Plaintiff's Fibromyalgia Was Exacerbated by Exposure to Lead

Lowe offers the opinion that Plaintiff's fibromyalgia worsened as a result of exposure to lead (Doc. # 40, Exhibit 3 at 63). Lowe believes that the lead exposure caused Plaintiff's fibromyalgia to become worse both directly, by interfering with Plaintiff's thyroid function, and indirectly, by causing Plaintiff stress. *Id.* at 94-95. Lowe explains that his opinion that lead exposure directly results in an exacerbation of fibromyalgia is based on his observation of three previous fibromyalgia patients who were exposed to lead and based on literature showing that lead effects thyroid function, which Lowe believes is linked to fibromyalgia. *Id.* at 117-20, 96. Lowe further explained the mechanism by which he believes lead directly increased Plaintiff's fibromyalgia symptoms in his additional declaration and report submitted with Plaintiff's response to Defendants' motion in limine (Doc. # 46-1). Lowe concedes, however, that there are no tests, reports, or medical records to back up the conclusion that the lead itself lead to worsened fibromyalgia, and in particular, that he does not have information about Plaintiff's thyroid hormone levels from before and after the lead exposure (Doc. # 40-1, Exhibit 3 at 96-99). As to the stress related to lead exposure's effect on Plaintiff, Lowe indicated that fibromyalgia patients have "low stress tolerance" and cannot cope with the demands that increased stress hormones place on their bodies. *Id.* at 94-96.

Lowe characterized his opinion that lead exposure both directly and indirectly

exacerbated Plaintiff's fibromyalgia as a "plausible" explanation of Plaintiff's increased symptoms. *Id.* at 136. In his deposition, Lowe initially stated that his opinion is the "most plausible" explanation. When Plaintiff's counsel questioned Lowe about this opinion at the end of the deposition, Lowe stated "I think it's likely that the increased symptoms . . . are [] a part of fibromyalgia. And I think it's plausible that it's secondary to the lead exposure." *Id.* at 136. Because the opinion is admittedly speculative, this testimony is inadmissible under Federal Rule of Evidence 702. Testimony about Plaintiff's increased symptoms that provides a "plausible" explanation for the exposure will not assist the jury to determine any fact at issue in the case. *See* Fed. R. Evid. 702. Furthermore, Lowe's theory of causation relies on his theory that fibromyalgia is caused by thyroid dysfunction, a theory which the Court finds is not admissible for the reasons discussed above. Because Lowe's theory of causation rests heavily on this inadmissible theory, the opinion is not grounded in valid science, rendering it inadmissible under the reliability prong of *Daubert. See Daubert*, 509 U.S. at 593-95.

The Court therefore grants Defendants' motion in limine as to Lowe's opinion that Plaintiff's fibromyalgia was exacerbated by lead exposure. Because the Court concludes that Lowe's testimony is inadmissible with or without the additional evidence submitted with Plaintiff's response, the Court will not address Defendant's contention that attempting to submit additional evidence at this late stage is improper.

## CONCLUSION

Defendants' Motion in Limine (Doc. # 40) is GRANTED IN PART and DENIED IN PART.

DATED: October 30, 2009

*William Q. Hayes*

**WILLIAM Q. HAYES**
United States District Judge